UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WM CAPITAL PARTNERS, LLC,

       Plaintiff,

                                                  Case No. 1:13-cv-549

v.                                               Hon. Hugh W. Brenneman, Jr.

MICHAEL C. COON and
SHEA COON,

       Defendants.
_____/

**OPINION**

        Plaintiff, WM Capital Partners, LLC ("WM Capital") filed the present diversity action against defendants Michael C. Coon ("Mr. Coon") and Shea Coon ("Mrs. Coon") (collectively referred to as "Borrowers") for failure to pay amounts owed on two promissory notes. This matter is now before the court on WM Capital's motion for summary judgment (docket no. 20).

        **I.**        **The complaint**

        **A.**        **WM Capital's allegations**

        WM Capital set forth the following allegations in its complaint. On or about March 1, 2007, Borrowers executed and delivered a promissory note (the "First Note") to Tennessee Commerce Bank ("TCB") in which they jointly and severally promised to repay TCB the principal amount of $67,000.00 plus accrued interest. Compl. at ¶ 6; First Note (docket no. 1-1). On or about October 3, 2007, Borrowers increased the total amount of their indebtedness when they executed and delivered another promissory note (the "Second Note") to TCB in which they jointly and severally promised to repay TCB the increased principal amount of $121,513.52 plus accrued

interest.  Compl. at ¶ 7; Second Note (docket no. 1-2).  WM Capital refers to the amount owed on the Second Note as the "Indebtedness" at issue.  Compl. at ¶ 7.

On or about March 30, 2010, Borrowers entered into a forbearance agreement (the "Forbearance Agreement") with TCB in which they acknowledged that defaults existed under the Second Note and agreed to pay all interest due as well as monthly interest only payments through the end of the forbearance period.  Compl. at ¶ 8; Forbearance Agreement (docket no. 1-3).  Under the terms of the Forbearance Agreement, the forbearance period commenced on March 30, 2010 and terminated on March 30, 2011.  Forbearance Agreement at p. 1 and ¶ D.

On or about June 30, 2011, Borrowers entered into a forbearance extension agreement (the "Forbearance Extension Agreement") with TCB in which they acknowledged that continuing defaults existed under the Second Note, agreed to pay all interest due as well as monthly interest only payments through the end of the forbearance period, and extended the forbearance period by five months, with Borrowers to resume making payments on the Second Note on August 31, 2011. Compl. at ¶ 9; Forbearance Extension Agreement (docket no. 1-4).  Collectively, the First Note, Second Note, Forbearance Agreement and Forbearance Extension Agreement comprise the "Loan Documents" at issue in this lawsuit.

On Friday, January 27, 2012, approximately five months after the August 31, 2011 termination of the Forbearance Extension Agreement, the Tennessee Department of Financial Institutions closed TCB, and the Federal Deposit Insurance Corporation ("FDIC") was named Receiver.  Compl. at ¶ 11.  WM Capital purchased TCB's loan to Borrowers from the FDIC.  *Id.* at ¶ 12.  On August 9, 2012, the FDIC, in its capacity as Receiver for TCB, assigned all of TCB's rights and remedies against Borrowers to WM Capital.  Compl. at ¶ 13; Assignment and Assumption

of Interests and Obligations (the "Assignment and Assumption Agreement") (docket no. 1-5). According to the Assignment and Assumption Agreement, WM Capital and the FDIC entered into a loan sale agreement ("LSA") dated August 9, 2012, which included Borrowers' loan (identified on Exhibit A attached to the assigment). *See* Assignment and Assumption Agreement. The Assignment and Assumption Agreement recites that under the LSA, the FDIC, as Assignor, "hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements." *Id.*

On October 3, 2012, the Second Note matured and all amounts due and owing to WM Capital under the Loan Documents became immediately due and owing. Compl. at ¶ 14. On February 20, 2013, WM Capital sent a demand letter to each of the Borrowers notifying them that they were in default and that the entire $109,489.87 balance of the Indebtedness under the Loan Documents was immediately due and owing (the "Demand Letters"). *Id.* at ¶ 15; Demand Letters (docket nos. 2-1 and 2-2).

### B. WM Capital's claims for relief

In Count I, WM Capital alleged that Mr. Coon failed to make payments pursuant to the Loan Documents, which includes all principal and accrued interest not paid as of October 3, 2012, a late charge in the amount of 5% for each late payment, and all attorneys' fees and expenses incurred by TCB and WM Capital. Compl. at ¶¶ 17-23. This results in an amount due from Mr. Coon in excess of $109,489.87 plus interest, late charges and attorneys' fees and expenses, and "such other and further relief as this Court deems just and appropriate." *Id.* at p. 4. In Count II, WM Capital alleged the same claims against Mrs. Coon. *Id.* at ¶¶ 24-30 and p. 5.

### C. Borrowers' Answer

In their answer, Borrowers admit that they executed the Loan Documents, that the Second Note matured on October 3, 2012, that they received the Demand Letters from WM Capital, that the Second Note imposed a late charge of 5%, and that they "have not made any payments on the Loan Documents subsequent to the Demand Letters." Answer at ¶¶ 4-9, 14-16, 18-20, and 25-27 (docket no. 9). Borrowers also admit that they are responsible for attorneys' fees and expenses that TCB and WM Capital incur to collect on the Indebtedness "to the extent that collection is appropriate." *Id.* at ¶ 21. However, Borrowers deny "that a balance was owed" on the Second Note and that they "failed to make payments." *Id.* at ¶¶ 14, 23 and 30.

Borrowers have raised four affirmative defenses: a right of offset; detrimental reliance; "equitable - unjust enrichment"; and promissory estoppel. Affirmative Defenses (docket no. 9-2). The gist of these defenses is set forth in their first affirmative defense for a right of offset, in which they state as follows:

> Defendant M. Coon performed brokerage services for the benefit of Tennessee Commerce Bank ("TCB"). The brokerage services were for the purpose of selling defined pooled notes. Defendant M. Coon performed the services in full resulting in the sale of over $10,000,000 worth of notes. Defendant M. Coon's standard commission is 1.0% of the gross note purchase price. In this case, the commission totaled about the same amount as the outstanding balance on the promissory note in this present case. Defendant M. Coon requested that TCB apply the amount to the outstanding balance of the promissory note. TCB agreed, but advised that they needed to get legal to handle the matter. The request for finalization was made a number of times, but TCB persons with whom Defendant M. Coon worked were involved in "bigger issues" and simply represented repeatedly that they would get it done.

Affirmative Defenses at ¶ 1. Mrs. Coon does not assert any affirmative defenses based on her actions, but rather relies on Mr. Coon's actions as inuring to her benefit.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

## III. The parties' positions

In its motion for summary judgment, WM Capital points out that the existence of the Loan Documents is uncontested. The issue is whether it is bound by an alleged oral modification

5

of the documents as claimed by Borrowers, i.e., that Mr. Coon offset the amount owed under the Loan Documents by performing brokerage services to TCB.  WM Capital contends that it is entitled to summary judgment because  Tennessee law applies in this matter, and the Tennessee statute of frauds prohibits the oral modification of contracts.  In support of its position, WM Capital cites a portion of that statute, which  states in relevant part:

>  [n]o action shall be brought against a lender or creditor…upon any promise or commitment to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement. . .  shall be in writing and signed by the lender or creditor, or some other person lawfully authorized by such lender or creditor.

Tennessee Code Annotated § 29-2-101(b)(1).

In their response, Borrowers contest the application of this statute on five grounds: first, defendants contend that Mr. Coon's credit for his commission was an accounting function, not a modification of the Loan Documents;[1] second, that Tennessee law permits oral modification of a written contract, citing *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.2d 606, 611 (Tenn. Ct. App. 2011); third, that  Borrowers can claim the right of offset under Tennessee law, citing *Polk v. Torrence*, 218 Tenn. 680, 405 S.W.2d 575 (1966); fourth, that Mr. Coon entered into either a contract implied in fact or a contract implied in law with TCB to perform brokerage services, citing *ICG Link, Inc. v. Steen*, 363 S.W.2d 533 (Tenn. Ct. App. 2011); and fifth, that TCB is barred by "detrimental reliance/promissory estoppel" from denying its agreement to pay Mr. Coon a commission of $57,591.44 for selling a pool of notes totaling over $10,000,000.00, and "to credit

---

[1] While Borrowers refer to their response as a counter-motion for summary judgment, it was not properly filed as a motion and was docketed as a response. *See* Defendants' Response (docket no. 23).

the commission against his note." In support of this defense, Borrowers cite *Calabro v. Calabro*, 15 S.W.3d 873 (Tenn. Ct. App. 1999).

At the close of the motion hearing, the Court requested the parties file supplemental briefs regarding whether WM Capital was a holder in due course of the Loan Documents and whether there was a specific provision of the statute of frauds under Tennessee's version of the Uniform Commercial Code that applied to the Loan Documents at issue in this case.

### IV. Discussion

Despite the parties' initial presentation of this case as involving a question of state law, the Court views matter as involving a question of federal law involving the sale of assets by the FDIC.[2] It is undisputed that the FDIC acquired the assets of TCB and subsequently sold and assigned some of those assets, including the Borrowers' indebtedness, to WM Capital. The Court concludes that Borrowers cannot assert their affirmative defenses to diminish the value of the indebtedness which WC Capital acquired from the FDIC under the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e)(1).

> The *D'Oench, Duhme* doctrine takes its name from the decision of the *United States Supreme Court in D'Oench, Duhme & Co., Inc. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 456–62, 62 S.Ct. 676, 678–82, 86 L.Ed. 956 (1942), wherein the Court emphasized the strong public policy considerations for protecting the assets of failed

---

[2] While the parties address various aspects of the FDIC's sale and assignment of the Borrowers' indebtedness to WM Capital, the Court notes that neither party has addressed the significance of the Controlling Law provision of the Assignment and Assumption of Interests, which provides:

> 7. <u>Controlling Law</u>. Federal law of the United States shall control this Assignment. To the extent that federal law does not supply a rule of decision, this Assignment shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Assignment will require any unlawful action or inaction by either party.

Assignment and Assumption of Interests.

> banking institutions. To that end, the Supreme Court held that a debtor is estopped from asserting any defense based on an unwritten "side agreement" between the debtor and the original lender that would alter the terms of a debtor's note. *Id.* at 461–62, 62 S.Ct. at 681–82. This holding was subsequently codified in 12 U.S.C. § 1823(e).

*National Enterprises, Inc. v. Smith*, 114 F.3d 561, 563-64 (6th Cir. 1997).

As the court explained in *First Union National Bank of Florida v. Hall*, 123 F.3d 1374 (11th Cir. 1997):

> In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that the FDIC's interest in an asset it acquired from a failed bank could not be diminished by alleged "agreements" not disclosed in the failed bank's records. *D'Oench*, *Duhme* and its progeny enable the FDIC, and banks that acquire insolvent banks' assets from the FDIC, to make quick and accurate appraisals of the value of insolvent banks' assets <u>by protecting the FDIC and its transferees against undisclosed agreements that would unexpectedly diminish the value of those assets</u>.

*First Union National Bank of Florida*, 123 F.3d at 1379 (footnotes omitted) (emphasis added). In this regard, the court in *First Union National Bank of Florida* stated, "[t]he *D'Oench, Duhme* doctrine has been expanded to protect entities to whom the FDIC, acting in its capacity as receiver of failed banks, has transferred assets formerly belonging to a failed bank." *Id.* at 1379, fn. 9.

The *D'Oench, Duhme* doctrine has been codified at 12 U.S.C. § 1823(e)(1), which provides as follows:

> (e) Agreements against interests of Corporation [FDIC]
>
> (1) In general
>
> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--
>
> (A) is in writing,

> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

In *National Enterprises, Inc.*, the Sixth Circuit observed that several courts had extended the protections against "side agreements" provided by 12 U.S.C. § 1823(e)(1) to the FDIC's assignees who purchased the assets of a failed institution:

> Relying upon the public policy considerations expressed in *D'Oench, Duhme* and the common law of assignments, several federal courts have extended to the FDIC's assignees the same rights as the FDIC possesses in enforcing the obligations of a failed institution," holding that "a private entity that purchases the assets of a failed institution from the FDIC is protected against side agreements between a debtor and original lender to the same extent as the FDIC, even though the literal language of section 1823(e) and *D'Oench, Duhme* does not so provide. *See, e.g., Porras v. Petroplex Sav. Ass'n*, 903 F.2d 379, 381 (5th Cir. 1990); *Bell & Murphy & Assocs., Inc. v. Interfirst Bank Gateway*, 894 F.2d 750, 754–55 (5th Cir. 1990). Similarly, courts relying on the policy espoused in *D'Oench, Duhme* have held that the FDIC and RTC may assign several other substantive rights under FIRREA. *See, e.g., Federal Deposit Ins. Corp. v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993) (applying *D'Oench, Duhme* to allow assignment of the FDIC's six-year extended statute of limitations under 12 U.S.C. § 1821(d)(14)(A)); *Federal Sav. and Loan Ins. Corp. v. Cribbs*, 918 F.2d 557, 559–60 (5th Cir. 1990) (extending the status of a federal holder in due course to private assignees of the FDIC and FSLIC); *Federal Deposit Ins. Corp. v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989) (extending the status of a holder in due course to private parties who acquire notes from the FDIC); *Mountain States Fin. Resources Corp. v. Agrawal*, 777 F.Supp. 1550, 1552 (W.D.Okla. 1991) (allowing assignment of the six–year statute of limitations).

*National Enterprises, Inc.*, 114 F.3d at 563-64.[3]

Other courts have agreed that the protections set forth in § 1823(e)(1) apply to FDIC assignees like WM Capital. *See, e.g., Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999) ("[t]he *D'Oench, Duhme* doctrine prevents a party from asserting an oral agreement as the basis for either a claim or defense against the FDIC, or against any of its assignees") (internal citation omitted); *UMLIC-Nine Corp. v. Lipan Springs Development Corporation*, 168 F.3d 1173, 1179 (10th Cir. 1999) ("*D'Oench, Duhme* applies to actions brought by FDIC's assignees as well as by FDIC itself"); *Federal Financial Company v. Hall*, 108 F.3d 46, 49 (4th Cir. 1997) ("[w]e and several other Courts of Appeals have held that the *D'Oench, Duhme* rule protects the FDIC's assignees as well, even though § 1823(e) is silent with regard to assignees")*; Community Bank of Ozarks v. F.D.I.C.* , 984 F.2d 254, 257 (8th Cir. 1993) ("[t]he *D'Oench* doctrine also applies to transferee banks for essentially the same reasons it applies to the FDIC"); *Kuhlmann v. Sabal Financial Group LP*, -- F. Supp. 2d --, 2014 WL 2765221 at *9 (W.D. Wash. 2014) ("[w]hile the language of section 1823(e) mentions only the FDIC, federal courts have consistently explained that 'a private entity that purchases the assets of a failed institution from the FDIC is protected against side agreements between a debtor and original lender to the same extent as the FDIC, even though the literal language of section 1823(e) and *D'Oench, Duhme* does not so provide'") (citing *National Enterprises, Inc.*, 114 F. 3d at 564) (internal brackets omitted); *Caires v. JP Morgan Chase Bank*, 745 F.Supp.2d 40, 53 (D. Conn. 2010) ("the Court finds that the Defendant is entitled to the

---

[3] While the Sixth Circuit implicitly endorsed the extension of § 1823(e)(1) to the FDIC's assignees, it held that "[n]o court, however, has yet extended to a private entity the FDIC and RTC's statutory right to sue in federal court, and we do not do so in this case." *Id.* at 564. The prohibition in *National Enterprises, Inc.*, is inapplicable in this case, which was not brought under the FDIC's statutory right to sue in federal court, but rather as a diversity action pursuant to 28 U.S.C. § 1332. *See* Compl. at ¶ 1.

protections of the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) as an assignee of the FDIC");

*AAI Recoveries, Inc. v. Pijuan*, 13 F.Supp.2d 448, 451 (S.D.N.Y. 1998) ("[a]lthough Congress only codified the *D'Oench, Duhme* doctrine with regard to the FDIC, courts have extended the rule to include third party assignees and transferees").

The Court finds the reasoning of these courts persuasive, and concludes that § 1823(e)(1) is applicable to WM Capital as an assignee of the FDIC. Borrowers contend that § 1823(e)(1) does not apply, because it is possible that the LSA between WM Capital and the FDIC contained a paragraph which excluded the rights granted to the FDIC under § 1823(e). Defendants' Supplemental Brief at pp. 3-8. Borrowers rely on ¶ 5.18 "Use of FDIC's Name and Reservation of Statutory Powers" which appears in a sample LSA form, and which provides in pertinent part as follows:

> . . . Buyer acknowledges and agrees that the assignment of any Loan or Collateral Document pursuant to the terms of this Agreement shall not constitute the assignment of any other rights, powers or privileges granted to Seller pursuant to the provisions the Federal Deposit Insurance Act, including, without limitation, those granted pursuant to 12 U.S.C. §1821(d), 12 U.S.C. §1823(e) and 12 U.S.C. §1825, all such rights and powers being expressly reserved by Seller; nor, shall Buyer assert or attempt to assert any such right, power or privilege in any pending or future litigation involving any Loan purchased hereunder. Buyer and Seller agree and stipulate that breach of the provisions of this section will result in actual and substantial damages to Seller in an amount that cannot be determined with precision. It is therefore agreed that in the event of such breach, Buyer shall pay the sum of $25,000.00 to Seller for each such breach as liquidated damages, together with such fees and expenses as Seller may incur in preventing further of continuing breach of said provision and recovering liquidated damages. Notwithstanding the provisions of this section, FDIC may also pursue any equitable remedy it may have for Buyer's breach of this covenant.

Defendants' Supplemental Brief at pp. 3-4.

While the FDIC may have reserved some of its rights under § 1823(e)(1) by including ¶ 5.18, there is no evidence that this paragraph appeared in the LSA between the FDIC and WM

Capital. In their brief, Borrowers have attached an unexecuted sample of an FDIC Loan Sale Agreement, identified as "Version 3 (AM) April 30, 2012" ("Version 3"). *See* Sample Loan Sale Agreement (docket no. 28 at pp. 23- 76). While the Assignment and Assumption of Interest between the FDIC and WM Capital utilized the form identified as "Version 3," there is no evidence that the parties' LSA utilized Version 3, and even if they did utilize it, that ¶ 5.18 was incorporated into that form.[4]

Finally, to the extent that Borrowers contend that the FDIC Statement of Policy 5000 ("Statement of policy regarding federal common law and statutory provisions protecting FDIC, as receiver or corporate litigator, against unrecorded agreements or arrangements of a depository institution prior to receivership") (docket no. 28 at pp. 77-88) affects WM Capital's ability to rely on § 1823(e)(1), their contention is unpersuasive. Borrowers do not point out how that policy prohibits WM Capital from relying on the provisions of § 1823(e)(1).

In applying § 1823(e)(1), the Court concludes that Borrowers' affirmative defenses ( all of which relate to an unwritten side agreement between Mr. Coon and TCB which predated the FDIC's acquisition of TCB's assets) are barred by that statute as an unwritten agreement "which tends to diminish or defeat the interest" of the FDIC's assignee, WM Capital. The terms of the purported agreement are set forth in an affidavit executed by Mr. Coon which states as follows. From about 2001 until September 2011, Michael Coon "worked with TCB and its officers on

---

[4] In this regard, the Court notes that there are variances between the Assignment and Assumption of Interests at issue in this case and the sample Version 3 form provided by Borrowers. Such variances appear in the fourth, fifth and seventh paragraphs of page D-1. In other words, even if the FDIC used Version 3 of the LSA, it is simply unknown as to whether the LSA between the FDIC and WM Capital contained all of the terms set forth in the sample form. The Court further notes that discovery closed on February 1, 2014. *See* Case Management Order (docket no. 14). Based on their briefing, it appears that Borrowers did not obtain a copy of the LSA at that time.

building the bank and managing portfolios as an independent company named Enterprise Funding Group." Michael Coon Aff. at ¶ 3 (docket no. 23-2). According to Mr. Coon, "TCB was very familiar with me and my experience level." *Id.*

Michael Coon's affidavit set forth his communications with TCB with respect to his alleged agreement to exchange brokerage services for a reduction in his outstanding loan balance as follows:

> 4. In Early 2011, I was asked by Tennessee Commerce Bank to broker, advise or sell some of its loan portfolio. I had sold loans to it in the past and it wanted me to use my experience and contacts to sell a number of loans, as required by their regulators. I had proposed that any compensation received as a result of a sale would be applied against the outstanding loan balance. This proposal was received positively by TCB and I was led to believe that once all loan sales had been concluded, there would be a final accounting and a reduction or elimination of the loan balance would occur at that time.
>
> 5. I had worked with Doug Rogers since about year 2005. I came to know Doug Rogers as the senior vice president of TCB and the second in command. I also worked with Tommy Crocker who I came to know as the vice president of special assets (i.e. nonperforming loan portfolios). Both were senior management and appeared to have authority to enter into the agreements for the sale of loans, payment of commissions, and the terms of my services.
>
> 6. Pursuant to my brokerage and services, on or about May 2011 TCB entered into an agreement with a third-party buyer for a total of about $10,518,000 closed through September 2011 by a series of transactions. After the transactions closed, TCB and I agreed on the following commission credit against the loan: $10,000 representing a 1.0% commission on the first $1,000,000 of loan sales plus $47,591.44 representing a 0.5% commission on the remaining loan sale amount.
>
> 7. I contacted TCB on several occasions to resolve the matter of the outstanding loan balance and to obtain accounting confirmation of the fee credit consistent with our mutual understanding. TCB made little or no effort to return calls or resolve the matter as they had advised me that TCB was working with regulators and backed up with numerous issues and would get to it soon.
>
> 8. Despite my repeated demands for an accounting and to finalize our mutual resolution to the remaining balance, I was always told that the bank is busy right now and it will be done soon. I pushed repeatedly only to get a response promising a

> response but that it would be delayed. TCB stopped all return communication in January 2012.
>
> 9. It was not until July 2012 that I received notice from the FDIC that TCB had closed and was under control of the FDIC. I spoke with the FDIC (Torn N. Wineland) and was advised that there were a lot of other similar situations out there with TCB, but that they were aware of his situation and would review it. He requested a narrative of the issues. I drafted and submitted it to Mr. Wineland. I called a number of times without success. Again, it all simply stopped until the demand letter was received from [WM Capital].
>
> 10. I then received a demand letter. The demand letter contained an incorrect balance as it failed to provide credit for the commission.

*Id.* at ¶¶ 4-10.

While Mr. Coon's affidavit is evidence of some type of oral agreement to modify the amount of his outstanding indebtedness, he has not presented any writing to support the existence of his side agreement with TCB. Indeed, there is no written evidence of the $10,518,000.00 transaction or transactions with an unidentified third-party upon which Michael Coon bases his claim.

In an attempt to demonstrate that the Mr. Coon and TCB had a written agreement, Borrowers provided additional information attached to their supplemental brief. First, Borrowers presented an "Officer's Narrative" from TCB Loan Officer Tim Mortimer, dated June 1, 2011, regarding the status of their loan. *See* Officer's Narrative (docket no. 28 at pp. 89-90). This narrative notes that Mr. Coon "recently acquired a job that will increase his income to better meet his monthly debt payments" and that "[t]he specific source of repayment will by Mr. and Mrs. Coon's income from employment." *Id.* at p. 89. The narrative also includes new information in a "summary and recommendations" suggesting that Mr. Coon might use certain commissions to pay down his loan:

14

> Since inception of the loan, Mr. Coon has made on time monthly payments through current date. Mr. Coon is working with TCB in reference to a sale of loans for which he can use the commission to paydown the principal on his loan. With Mr. Coon's new employment, this will enable him to continue to make payments to TCB and other creditors. It is recommended that this request be approved for a 90 days interest only period to provide Mr. Coon ample time to resolve the commission issues with TCB in reference to the loan sale for which those funds will be used to pay down the principal balance [sic]

*Id.* at p. 89.[5] While vague at best, this recommendation appears to have been in support of the June 30, 2011 forbearance extension agreement previously mentioned, which made no mention of using commissions to pay down debt.

Second, Borrowers submitted a copy of a document from loan officer Tim Mortimer, dated 1/30/12, entitled "LOAN APPROVAL/ASM/INTERIM ACTION REQUEST." *See* Loan Approval (docket no. 28 at p. 90). The new request is for interim action on the loan to "amortize $40,331.77 for 60 months at 5.% interest - Discount current balance by $57,591.44 due to comision [sic] on sale of loans. Past due interest will be paid at closing." *Id.* The summary of the "new commitments requested" is as follows:

> It has been decided to apply the commission fees from the sale of loans to the loan and reduce the principal balance by $57,591.44 in order for the $757.95 monthly payment to service both the principal and interest over 60 months. This net effect of this transaction will all [sic] TCB to be full paid in full [sic].

*Id.*

A section of the loan approval form entitled "Request / Action and Officer Recommendation: (*Include justification of any approval exceptions*)" (emphasis in original), provides as follows:

---

[5] The Court notes that this summary appears at the bottom of an unnumbered page. The word "balance" appears as the last word on the page. Since there is no punctuation after the word "balance", it is unclear whether the summary ends with that word or whether the original document included additional pages.

>   Since inception of the loan, Mr. Coon has made on time monthly payments through current date. Mr. Coon is working with TCB in reference to a sale of loans for which he can use the commission to paydown the principal of his loan. With Mr. Coon's new employment, this will enable him to continue to make payments to TCB and other creditors. Since the last forbearance period, Mr. Coon and TCB has [sic] come to an agreement for the commisson [sic] that Mr. Coon earned assisting on the sale of a pool of loans. The total sale was $10,518,288 for which [sic] provided Mr. Coon with the following commission structure: One Percent (1%) on the first million - $10,000 and .5% on the remaining sale of $9,518,288 - $47,591.44 for a total of $57,591.44. Those commission funds will be applied directly to Mr. Coon's loan leaving a balance of $40,331,77 to be amortized over the next 60 months. It is recommended that this request be approved.

*Id.* This Request included a section for "APPROVALS SIGNATURES" with a "Note" that "committee and Board approvals to be signed by the respective chairperson." *Id.* However, there is no evidence that this document was ever approved by TCB's officers or directors. While the Request was initialed by an "officer" on 1/30/2012, the three spaces for concurrences of other officers identified as RLM, NLM and CCO, are blank. *Id.* There was no approval by the "Loan Committee," or its three members SAM, COO and CRO. *Id.* Finally, there was no approval by the "Board of Directors." *Id.* Moreover, and perhaps of pivotal significance, is the fact that the Tennessee Department of Financial Institutions closed TCB (and the FDIC was named Receiver) three days before this request for interim action on the defendants' loan was submitted to anyone by the loan officer. By this time, the bank had lost its authority to act.

Given this record, there is no evidence that a written agreement existed between Mr. Coon and TCB which could be asserted under § 1823(e)(1) because: (A) it was not in writing; (B) it was not executed by the depository institution (TCB) and any person claiming an adverse interest thereunder contemporaneously with the acquisition of the asset by TCB; (C) it was not approved by the board of directors of TCB or its loan committee, as reflected in the minutes of said board or

committee; and (D) it has not been, continuously, from the time of its execution, an official record of TCB.

Viewing the evidence in the light most favorable to the non-moving party (Borrowers), there is no genuine issue of material fact that the movant, WM Capital, is entitled to judgment as a matter of law. For these reasons, Borrowers' alleged agreement with the now defunct TCB is not valid against WM Capital, and WM Capital must prevail on its motion for summary judgment on the issue of liability.

While WM Capital seeks entry of a judgment against both Mr. and Mrs. Coon in the amount of $109,489.87, plus interest, late charges and attorneys' fees and expenses, it has not provided evidence to establish the specific amount owed. For that reason, WM Capital's motion for summary judgment will be denied without prejudice on the issue of damages. Accordingly, WM Capital may file a renewed motion for summary judgment to establish the dollar amount owed by Borrowers, within 14 days from entry of this opinion. If WM Capital chooses not to file such a motion, then this matter will proceed to trial on the issue of damages.

### V. Conclusion

WM Capital's motion for summary judgment (docket no. 20) will be **GRANTED** on the issue of liability and **DENIED** without prejudice as to the issue of damages. An order consistent with this opinion shall be issued forthwith.


Dated: September 22, 2014                    /s/ Hugh W. Brenneman, Jr.
                                             HUGH W. BRENNEMAN, JR.
                                             United States Magistrate Judge